## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT WILLIAM SHERWOOD and PAMELA LOUISE SHERWOOD, husband and wife,<br><br>        Plaintiffs,<br><br>vs.<br><br>BNSF RAILWAY COMPANY, a Delaware corporation d/b/a The Burlington Northern and Santa Fe Railway Company, and JOHN DOES I through X,<br><br>        Defendants. | Case No.: 1:16-cv-00008-EJL-REB<br><br>**MEMORANDUM DECISION AND ORDER RE MOTION TO COMPEL AND MOTION TO STRIKE SUPPLEMENTAL AUTHORITY (DKTS. 41, 125)** |

Presently before the Court are Plaintiffs' Motion to Compel (Dkt. 41) and Defendant's Motion to Strike Supplemental Authority (Dkt. 125). Having carefully considered the record, heard oral argument on the motion to compel on January 17, 2018, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## <u>BACKGROUND</u>

Plaintiff Robert Sherwood alleges he was injured when thrown from his bicycle after his wheel lodged in a gap between two concrete planks at a railroad crossing used by Defendant BNSF Railway Company ("BNSF") near Sandpoint, Idaho. Compl. ¶¶ 23, 24, 49–61, 65–70 (Dkt. 1). BNSF admits that Mr. Sherwood was involved in a bicycle crash on or near the crossing, but denies various other allegations, including that it is liable for Mr. Sherwood's injuries. *See generally* Ans. (Dkt. 5).

The accident occurred on July 14, 2014. Compl. ¶ 49 (Dkt. 1); Ans. ¶ 60 (Dkt. 5). Mr. Sherwood sued on January 6, 2016, alleging negligence. Compl. ¶¶ 90–96 (Dkt. 1). His wife,

Pamela Louise Sherwood, separately alleges a claim for loss of spousal consortium. *Id.* ¶ 97.

This case has engendered numerous motions from each party; over a dozen are presently pending. This decision resolves the Sherwoods' pending motion to compel and BNSF's motion to strike supplemental authority. In the motion to compel, the Sherwoods seek an order requiring BNSF to supplement its responses to several interrogatories and requests for production, and to reopen BNSF's corporate deposition under Federal Rule of Civil Procedure 30(b)(6). (Dkt. 41.)

Oral argument was heard on the motion to compel on January 17, 2018.[1] (Dkt. 121.) On February 8, 2018, the Sherwoods filed a statement of supplemental authority regarding the motion to compel. (Dkt. 123.) BNSF then moved to strike the filed supplemental authority. (Dkt. 125.) Both filings occurred after the hearing on the underlying motion to compel.

## LEGAL STANDARDS

"The Federal Rules of Civil Procedure contemplate full and equal discovery so as to prevent surprise, prejudice and perjury during trial." *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 910 (9th Cir. 2008) (quotation marks omitted). Rule 26(b)(1) permits discovery regarding nonprivileged matters that are relevant to any party's claim or defense. Federal Rule of Evidence 501 provides that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." In this diversity action, both claims raised by the Sherwoods arise under Idaho law. Accordingly, Idaho law on privilege applies.

Under Idaho law, "[t]he burden of showing [that] information is privileged, and therefore exempt from discovery, is on the party asserting the privilege." *Kirk v. Ford Motor Co.*, 116 P.3d 27, 34 (Idaho 2005). Idaho recognizes privileges related to attorney-client communications. I.C.

---

[1] Argument was also heard on two other motions at the same hearing. Those motions will be addressed in a separate decision. The Court did not hear argument on the motion to strike, but the Court's consideration of the same does not need oral argument.

§ 9-203(2). However, the existence of and parameters of the work-product doctrine are a matter of federal law (the work-product doctrine is just that, and not a privilege). Hence, the Court looks to Idaho law to determine whether a privilege is recognized, and to federal law to determine whether it has been properly raised and preserved. Doing so requires application of Federal Rule of Civil Procedure 26(b)(5)(A), which also applies to consideration of the work product doctrine.

Under Ninth Circuit law, failure to produce the privilege log required by Rule 26(b)(5)(A) does not lead to a "mechanistic determination" of waiver; rather, courts apply a "holistic reasonableness analysis" that looks at all the circumstances. *Burlington Northern & Santa Fe Ry. Co. v. U.S. Dist. Ct.*, 408 F.3d 1142, 1149 (9th Cir. 2005). Specifically, in deciding whether a privilege has been sufficiently asserted, courts consider (1) the degree to which the objection enables evaluation of the claimed privilege; (2) the timeliness of the objection and accompanying information about the withheld documents; (3) the magnitude of the document production; and (4) any other particular circumstances of the litigation. *Id.*

Significantly, boilerplate objections are presumptively insufficient and providing a privilege log within thirty days is presumptively sufficient. *Id.*

## **DISCUSSION**

The Sherwoods seek discovery in five areas. First, they seek details regarding BNSF's general incident investigation procedures. Mem. in Supp. 2–7 (Dkt. 41-1). Second, they seek interrogatory answers, deposition answers, and documents regarding BNSF's incident investigation for Mr. Sherwood's specific incident. *Id.* at 8–15. Third, they seek interrogatory answers regarding BNSF's destruction of physical evidence. *Id.* at 15–17. Fourth, they seek deposition answers regarding BNSF's failure to preserve physical evidence. *Id.* at 17–18. Fifth, they seek interrogatory answers and documents regarding BNSF's post-crash alteration of the

crossing. *Id.* at 18–19. Finally, the Sherwoods also seek an award against BNSF for their

expenses in bringing this motion. *Id.* at 19. Each of these requests will be taken up in turn.

## A. Discovery Regarding General Incident Investigation Procedures

The Sherwoods' request for production ("RFP") number 37 sought the following:

> Please produce all policies, procedures, or rules applicable to investigations and inspections related to the crash at issue in this case.
>
> This request does not seek policies, procedures, or rules applicable only to investigations and inspections of crashes that occurred in some other geographic area, at some other time, or under other circumstances (e.g. a train derailment or a motor vehicle crash). However, to the extent that a policy, procedure, or rule was applicable to both the investigations and inspections after the crash at issue in this case and to crashes in other locales, at other times, and under other circumstances, any such policy, procedure, or rule falls within the scope of this request.
>
> This request specifically includes, but is not limited to, policies, procedures, or rules for: forming an investigative team; creating a template in which to record information regarding the incident; logging information about the incident in any software program, application, or database; documenting the scene; taking and preserving photographs; preserving physical evidence; generating incident reports; and/or completing incident reports.

Mem. in Supp., Ex. 1 Local Rule 37.2 Addendum at 11 (Dkt. 41-2). BNSF objected to RFP 37:

> OBJECTION is made because the request on its face potentially seeks materials protected by the attorney-client privilege. FURTHER OBJECTION is also made because the request seeks written material regarding templates, software programs/applications/databases and other documentation regarding how BNSF and, specifically, how its Claims department functions, and such documents are protected as proprietary and confidential. *Castillon v. Corr. Corp. of Am.*, 2013 U.S.Dist. LEXIS 112729 (D.Idaho 8/6/2013). The BNSF Claims department operates under the direction of the BNSF Law Department. Any information that could be considered "policies, procedures, or rules applicable to investigations and inspections" are the equivalent of instructions from counsel.

*Id.* at 11–12.

The Sherwoods attack each of BNSF's objections. In response, BNSF argues that

"Plaintiffs learned all there is to know on this topic via the Rule 30(b)(6) deposition of BNSF

representative Daniel Flatten." BNSF Resp. 7 (Dkt. 52). BNSF quotes Mr. Flatten's testimony

that "[t]he claims department doesn't have policy. . . . The procedures that are written down are

designed to be a guide, a best practice, a road map, to help point individuals in the right direction to address issues they may encounter while conducting an investigation." Flatten Dep. 15:8, 16:12–16 (Dkt. 100-1).[2] BNSF also argues no reference guide or other document was consulted in BNSF's investigation of Mr. Sherwood's incident, so there are no responsive documents to produce. BNSF Resp. 9 (Dkt. 52).

These arguments miss the mark. RFP 37 requested "all policies, procedures, or rules *applicable* to investigations and inspections related to the crash at issue," not merely those that BNSF says, unilaterally, were in fact applied. As the Sherwoods point out, Mr. Flatten (BNSF's representative) confirmed that there are "procedures that are written down." A complete excerpt of the relevant exchange makes clear that the procedures referenced by Mr. Flatten are within the scope of RFP 37:

> Q. Who formulates policies for the claims department?
> A. The claims department doesn't have policy. And my understanding what I think we've agreed on as a term.
> Q. Okay. So there is no formal written documents within the claims department that mandate conduct?
> A. No.
> Q. Okay. So how is a claims representative in the field to know what he or she ought to do in investigating an incident?
> A. So we do have procedures. We do have a robust training program when we on-board people that consists largely of on-the-job training that people get boots on the ground. They deal with individual instances and they begin to build their universe of experience. We talked a little bit earlier about the hierarchy, the structure of the claims department. That on-job training is supervised by somebody within their chain of command and they are an additional resource for that individual. And so an individual by virtue of on-the-job training and experience ultimately begins to develop an understanding of what is necessary to deal with issues as they present themselves.
> Q. Okay. Are there any procedures that are written down or are they all, I guess, encapsulated in the institutional knowledge of the corporation?
> A. There are some procedures that are written down, but those procedures aren't specific to if you're handling "X" type of event, an individual will do "Y." The

---

[2] Each party filed excerpts of Mr. Flatten's deposition testimony. The full deposition testimony was filed as an attachment to an unrelated motion.

procedures that are written down are designed to be a guide, a best practice, a road map, to help point individuals in the right direction to address issues that they may encounter while conducting an investigation.

Q. Okay. **So there are documents** out there that are guides, best practices and road maps **that claims representatives in the field would use when conducting an investigation**; is that --

MR. MITCHELL: I'm going to object, mischaracterizes his testimony. You can answer, if you recall.

A. **There are documents that are available as a resource or a reference.**

Flatten Dep. 15:6–16:25 (Dkt. 100-1) (emphases added).

BNSF's counsel defending the deposition went to great lengths to focus the questioning on the topics listed in the notice of deposition; hence, the Court will not entertain any argument that the procedures mentioned at the conclusion of this excerpt were somehow outside the scope of, or otherwise distinct from, BNSF's incident investigation procedures.

Moreover, other portions of Mr. Flatten's testimony disclosed the existence of claims forms (at 68:23–69:7), correspondence templates (at 97:2–17), and photo log templates (at 156:10–20). It is not immediately clear from the context, however, whether each of these is within the scope of RFP 37.

Separately, after the oral hearing on this motion the Sherwoods filed supplemental authority consisting of an Order and Memorandum filed February 5, 2018 in *Kowalewski v. BNSF*, No. 37-CV-17-145 in the Fourth Judicial District of the State of Minnesota (Dkts. 123, 123-1). The state court judge in that case granted the planitiff's motion for sanctions against BNSF based on a number of "discovery and evidentiary abuses" including failure "to inspect and preserve" physical evidence and relevant documents. Order and Mem. 5 (Dkt. 123-1). The court also concluded that "BNSF's behavior in the present case is clearly part of a pattern and practice of behavior that extends nationwide." *Id.* at 35. The Sherwoods would like this decision to color this Court's view of the present discovery dispute, and the Court has reviewed the decision. In

doing so, and reviewing the Minnesota decision for any persuasive value it might have, the Court

is persuaded that certain of the findings made by the Minnesota court are directly relevant as to

whether documents exists that are called for by the Sherwoods' discovery requests, but as to

which BNSF has so far failed to identify or failed to produce. Several stark examples are the

references in the Minnesota decision to a "BNSF Claims Manual" (*Id.* at 5), a "General Code of

Operating Rules ("GCOR")"[3] (*Id.* at 16–17), "BNSF's Emergency Preparedness Plan" (*Id.* at

26), an "Emergency Response Guidebook" (*Id.* at 26), and a "Law Department Guide" (*Id.* at

31).

    Even so, the Emergency Preparedness Plan in particular appears to apply only to the

specific site where the incident in the Minnesota case occurred, which is not the same site where

Mr. Sherwood's accident occurred. *Id.* at 26. But at a minimum, the decision refers to

requirements in the BNSF Claims Manual to preserve and retain certain records in certain

circumstances. *Id.* at 22–24, 26. Such a document is inescapably responsive to a request for

"policies, procedures, or rules for . . . taking and preserving photographs [and] preserving

physical evidence." Mem. in Supp., Ex. 1 Local Rule 37.2 Addendum at 11 (Dkt. 41-2). Other of

the documents referenced in the Order may also be responsive, although this Court does not

expressly decide that issue today.

    The potential significance of the state court's order in the *Kowaleski* case is emphasized

by the fact of BNSF's motion to strike the supplemental filing from the record. (Dkt. 125.) BNSF

asserts that "[t]he alleged 'supplemental authority' consist of a highly contested sanction order

---

[3] It is not clear from the Minnesota Order whether the GCOR referred to therein is BNSF-specific or is the industry standard GCOR. Even if the GCOR to which the Order referred is an industry standard, BNSF amendments to the GCOR, if any, may well be responsive to the Sherwoods' discovery requests.

from a Minnesota court in a FELA personal injury action factually and legally unrelated to Mr. Sherwood and his claims." *Id.* at 1–2. BNSF contends the "supplemental authority is irrelevant, has no probative or dispositive value on the discovery issues in plaintiffs' motion to compel, and is highly prejudicial and inflammatory." *Id.* at 2. In sum, BNSF argues that the Order acknowledges the existence of a "Law Department Guide" but that BNSF has already admitted in this action that such a document exists, that it was not used in connection with Mr. Sherwood's incident or investigation, that the document is not otherwise relevant to this matter, and that the document is privileged. Mem. ISO Obj. and Mot. to Strike Suppl. Authority 3 (Dkt. 125-1).

BNSF further argues that the Order is not precedential or dispositive here. *Id.* at 5. Moreover, BNSF cites three cases, including one Supreme Court case, for the proposition that "unrelated discovery violations in other litigation do not provide a proper basis for imposing discovery orders or sanctions in a matter presently before the Court." *Id.* at 6 (citing *Taylor v. Illinois*, 484 U.S. 400, 416 n.22 (1988); *U.S. v. Ivory*, 131 Fed. Appx. 628, 632 (10th Cir. 2005); *State v. Peterson*, 2016 WL 2843012 (Minn. App. 2016) (unpublished)). BNSF supported its motion to strike with a declaration of counsel indicating BNSF filed a pleading with the Minnesota court "to contest, dispute and refute the contents of the Order." Mitchell Decl. ¶ 2 (Dkt. 125-2). That pleading is attached to counsel's declaration. (Dkt. 125-3.)

The Court has carefully reviewed BNSF's motion to strike, but will not grant the motion. As an initial matter, BNSF's case citations are inapposite. All three cases dealt with discovery violations in a criminal rather than a civil case. In *Taylor*, the key statement by the Supreme Court was that "[u]nrelated discovery violations in other litigation would not, however, normally provide a proper basis for curtailing the defendant's constitutional right to present a complete

defense." 484 U.S. at 16 n.22. Here, BNSF has a strong interest in presenting the best defense it can muster but in a civil case such as this one, the constitutional implications relevant in *Taylor* are simply not present. Furthermore, *Taylor* did not categorically ban the consideration of discovery violations in other litigations; it merely held that doing so would not normally be proper – without discussing the circumstances in which it could be proper.

But the fatal blow to BNSF's motion is that it mischaracterizes the purpose for which the Sherwoods filed the supplemental "authority." Contrary to BNSF's argument, the Sherwoods do not ask this Court to sanction BNSF for alleged discovery violations as occurred in the *Kowalewski* case. The present dispute revolves around what documents exist, and the Court considers the *Kowalewski* Order in that context, not as to whether discovery sanctions should be imposed. The *Kowalewski* Order is appropriately considered in whether the Sherwood's motion to compel should, or should not, be granted.

BNSF also argues that the Minnesota decision is irrelevant because it discusses a "Law Department Guide" whose existence has already been admitted. However, BNSF has been vague about what documents do exist, so that this argument cannot be meaningfully evaluated. Mr. Flatten acknowledged the existence of certain written procedures, but did not refer to them as part of a "Law Department Guide" in either his deposition or his declaration, so it is unclear whether he was referencing that document or some other resource. *See* Flatten Dep. (Dkt. 100-1); Flatten Decl. (Dkt. 55). BNSF also cites a declaration of its Claims Agent Joshua Gore in support of its assertion the Law Department Guide has already been acknowledged. Mem. ISO Obj. and Mot. to Strike Suppl. Authority 3 (Dkt. 125-1). But Mr. Gore's declaration likewise speaks generally about a "reference guide" without calling it by name. Gore Decl. ¶ 2 (Dkt. 54). Whether there is an institutional ambiguity, or a litigation disingenuousness, in all of that is an

open question. Perhaps both Mr. Flatten and Mr. Gore were referring to the Law Department Guide when making their remarks. But it is conceivable they were instead referring to a "Claims Manual"[4] or to some other document that has not yet been identified by name in this litigation. Regardless, whatever moniker it carries in whatever corner of the BNSF organization, the Law Department Guide, as described in the Minnesota Order, is responsive to RFP 37 and it was therefore BNSF's duty to disclose it or timely provide a privilege log describing the basis for not producing it. BNSF's motion to strike is denied.

Having established that at least some additional responsive documents exist, the Court must now consider whether BNSF's objections withstand scrutiny. In its discovery response, BNSF objected that the request seeks materials protected by the attorney-client privilege, and, separately, "protected as proprietary and confidential" under *Castillon v. Corr. Corp. of Am.*, 2013 U.S. Dist. LEXIS 112729 (D. Idaho Aug. 6, 2013). In its briefing, BNSF also argues that the request seeks materials protected as attorney work-product. BNSF Resp. 3–5 (Dkt. 52). None of these arguments has merit.[5]

---

[4] If the "Claims Manual" is even distinct from the "Law Department Guide." The Court recognizes the possibility that the Claims Manual and the Law Department Guide may, in fact, be different names for the same document. The very fact that this point is in question underscores that BNSF's candor and clarity leave much to be desired.

[5] BNSF also argues that "the courts have determined that the question of whether a communication is confidential – and therefore subject to protection by the attorney-client privilege – turns on the subjective belief of the client, which must be reasonable under the circumstances. *Morningstar Holding Corp. v. G2, LLC*, 2011 U.S.Dist. LEXIS 114687, *18-19 (D.Idaho 2011) (citing, *Swenden v. Corey*, 2011 LEXIS 41340 (D. Idaho 2011); *Warner v. Stewart*, 129 Idaho 588 (1997))." The Court does not glean the same conclusions from the cases cited for that proposition; rather, the cases examine a (putative) client's belief of whether there is an attorney-client relationship, not whether a particular communication is confidential. None of the cases addresses the confidentiality of communications. The decisions do not hold that a subjective belief about the confidentiality of a communication determines whether it is protected by the attorney-client privilege.

As an initial matter, BNSF takes the position that its internal policies and procedures are protected by the attorney-client privilege and/or as work-product because they were created by counsel in anticipation of litigation. It is well-understood that the mere fact that a person is a lawyer does not lay a cloak of privilege upon everything that lawyer prepares, sees, or hears. *U.S. v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996). For instance, "communications between in-house counsel and corporate representatives, unlike those between a client and outside counsel, are not presumed to be made for the purpose of obtaining legal advice." *Dewitt v. Walgreen Co.*, 2012 WL 3837764 at *3 (D. Idaho Sept. 4, 2012) (citing *U.S. v. ChevronTexaco Corp.*, 241 F.Supp.2d 1065, 1076 (N.D. Cal. 2002)). Conversations among BNSF personnel regarding factual matters or business-related considerations in drafting or disseminating policy are not privileged, regardless of whether in-house counsel is a party to the communications.

Nor does the fact that in-house counsel drafted, revised, or reviewed a document or policy necessarily make it protected by the work-product doctrine. The doctrine does not protect materials prepared "in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes." FED. R. CIV. P. 26(b)(3) Advisory Committee Notes, 1970 Amendment. A corporation's legal compliance policy that serves as a reference or instructional guide to corporate employees is primarily a "business" policy rather than a "legal" policy, even if based on the advice of counsel. *See, e.g., In re Domestic Drywall Antitrust Litig.*, MDL No. 2437, 2014 WL 5090032 at *4 (E.D. Penn. Oct. 9, 2014). "The work product rule does not come into play merely because there is a remote prospect of future litigation." *Dewitt*, 2012 WL 3837764 at *5 (citing *Fox v. Calif. Sierra Fin. Servs.*, 120 F.R.D. 520, 524 (N.D. Cal. 1988)).

During oral argument, counsel for BNSF said that BNSF expects to be sued any time its property is involved in an incident, and therefore its incident investigation procedures are protected under the work-product doctrine because they were prepared "in anticipation of litigation." But expectations must have some grounding in common-sense, and even if counsel drafted the policies in anticipation (whether possible or likely), there are also readily-apparent business needs related to operational safety and, in some circumstances, regulatory requirements, that call for creating and communicating such policies. Given this fact, BNSF's blanket assertion that its policies or procedures are privileged as attorney-client communications, or protected from disclosure as work product, simply goes too far.

There remains, nonetheless, the potential that a particular document (or documents) is privileged or protected. BNSF's first objection to RFP 37 was that the requested documents are protected by the attorney-client privilege. But BNSF did not provide a Rule 26(b)(5)(A)(ii) privilege log "describ[ing] the nature of the documents . . . not produced or disclosed . . . in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Doing so was a predicate burden to asserting the privilege. *Kirk*, 116 P.3d at 34; *see also* FED. R. CIV. P. 26(b)(5)(A)(ii); *Burlington Northern*, 408 F.3d at 1149. Having failed to do so, BNSF's assertion of privilege is presumptively insufficient. *Burlington Northern*, 408 F.3d at 1149. Applying the *Burlington Northern* factors, the Court concludes that BNSF did not provide enough information to evaluate its assertion of privilege. Further, the lack of any privilege log or other information about the relevant documents (at least some of which were acknowledged to exist in Mr. Flatten's deposition) means it did not timely support its assertion.

Nor has BNSF demonstrated that the magnitude of production would be great – especially given Mr. Flatten's deposition testimony that "[t]he Claims department doesn't have

policy." Flatten Dep. 15:8 (Dkt. 100-1). Finally, the Court concludes there are no particular circumstances of the case weighing in BNSF's favor. Accordingly, the Court concludes that any privilege that might have attached to those documents responsive to RFP 37 was waived.

Next, BNSF objected that the documents sought are proprietary and confidential, and thus protected from disclosure under *Castillon*. The reliance upon *Castillon* is misplaced, however, because in *Castillon*, the court granted a protective order limiting *dissemination* but not *discovery* in a civil rights case brought against an operating prison. *Castillon* MDO (Dkt. 41-4). The protective order restricted confidential information, depending on its level of confidentiality, from being distributed to certain categories of persons – an obvious concern in a penitentiary. *Castillon* Prot. Order (Dkt. 41-3). It withheld some information from public disclosure, and some other information from disclosure even to the inmate plaintiffs. *Id.* But in no instance was the defendant protected from having to disclose such documents and information to *counsel* for the plaintiffs. *Id.* Moreover, the court in *Castillon* cited the physical safety of prison employees and their families; the privacy of inmates' medical, institutional, and criminal records; and the security of the prison as reasons to grant the protective order. *Castillon* MDO (Dkt. 41-4).[6] In the instant case, BNSF has not suggested that any safety, privacy, or security interests are at stake here like they were in *Castillon*. The Court disagrees that BNSF's interest is sufficient to justify withholding otherwise-discoverable materials.

Finally, BNSF's invocation of the work-product doctrine is ineffective for the same reason its claim of attorney-client privilege is ineffective: Under the *Burlington Northern* factors, BNSF waived any protection or privilege that might otherwise have applied when it did not

---

[6] Although the court also granted the protective order on the basis that the prison had an interest in maintaining the confidentiality of its proprietary information, nothing in the opinion suggests this interest alone would have warranted a protective order. *Id.*

seasonably provide sufficient information to evaluate its assertion. As a separate basis for

denying its claim under the work-product doctrine, the record before the Court shows that BNSF

also did not comply with Rule 26(b)(5)(A)(i), requiring it to "expressly make the claim" the

information was protected work-product. Although BNSF's citation to *Castillon* in its response

to RFP 37 might be construed as asserting work-product protection, the Court is not persuaded it

was an express claim at that time. BNSF did expressly make such a claim in its briefing on this

motion, but the Court finds that claim was not timely. There is no room under the template of the

federal rules dealing with privilege logs, for a party to make generalized claims of privilege and

work product doctrine protection in the hope that the opposing party will not further pursue the

matter, and for that party to then later on seek to raise the privilege or work product doctrine

more specifically when a motion to compel is filed. The opportunity for mischief is obvious – a

party could make the generalized claim without meeting Rule 26(b)'s requirement to "describe

the nature of the documents . . . not produced or disclosed . . . in a manner that, without revealing

information itself privileged or protected, will enable other parties to assess the claim." Then, the

opposing party is left without any way of knowing what is being withheld, and left without

enough information to judge for itself whether the claim upon which the information being

withheld is justified.

Because the Sherwoods have shown there are additional responsive documents to RFP 37

and BNSF has not shown it is entitled to withhold them, the Sherwoods' motion to compel is

granted to the extent that it seeks the production of documents regarding BNSF's incident

investigation procedures. At a minimum this must include (1) those documents to which Mr.

Flatten referred in his deposition; (2) the BNSF Claims Manual; and (3) the BNSF Law

Department Guide. Where more than one version of a document exists, BNSF must produce all

versions that were either in effect as of July 14, 2014, or that may have otherwise been utilized in BNSF's actions regarding the July 14, 2014 incident.

The Sherwoods also requested that BNSF's Rule 30(b)(6) deposition be reopened with an order from the Court requiring that BNSF answer questions about its file system. Mem. in Supp. 7 (Dkt. 41-1). This request was based on Mr. Flatten's deposition testimony that "[t]here are not very many forms, that we have, that exist independent of our – of our file system of investigating things in anticipation of litigation." Flatten Dep. 161:15–18 (Dkt. 100-1). Inquiry into the details of that file system was objected to on the grounds that it was proprietary information; counsel instructed Mr. Flatten not to answer further questions on that topic. *Id.* 162:12–18, 163:11–12. The Sherwoods contend that the refusal to allow questioning on this topic prevented them from learning whether the facts support BNSF's assertion of privilege. Mem. in Supp. 4 (Dkt. 41-1).

BNSF frames this request as the Sherwoods' attempt to seek "production of (or access to?) BNSF's proprietary internal software, programs, and computer systems." BNSF Resp. 11–12 (Dkt. 52). They allege the Sherwoods "just want to go fishing around in BNSF's computer system to see what they can find – and such request is not permissible under the controlling law prohibiting such 'discovery on discovery.'" *Id.* at 12.

The Sherwoods do not seek an order allowing them either direct access to BNSF's electronic systems or license to conduct a fishing expedition. Rather, in light of counsel's refusal to allow further questioning after Mr. Flatten suggested BNSF's file system includes relevant documents, the Sherwoods seek an opportunity to inquire further about that response and about any other relevant and nonprivileged matters related to the file system referenced. This is a reasonable request, and the Court will grant it. BNSF is ordered to make Mr. Flatten (or a different a corporate representative with knowledge, if the parties can agree upon such other

representative) available for further deposition questioning on the topic of its file system as it relates to incident investigations.

## B. Discovery Regarding Specific Incident Investigation

The Sherwoods seek discovery regarding BNSF's specific investigation of Mr. Sherwood's incident. Mem. in Supp. 8–15 (Dkt. 41-1). In particular, the Sherwoods seek responses to Interrogatory 15, regarding all post-crash inspections performed pursuant to BNSF's policies and procedures; RFP 11, regarding all documents related to inspections; and RFP 35, regarding documents from post-crash inspections pursuant to BNSF policies and procedures. The Sherwoods specifically seek production of a "72-hour checklist" completed by the Claims department, sketches of the crossing, photo logs, and documented measurements. *Id.* at 12–14. Each category of requested discovery will be addressed in turn.

First, Interrogatory 15 provided:

> Please list each inspection of the Crossing that occurred following the crash at issue in this case that was related, in whole or in part, to investigating the crash and that was performed pursuant to BNSF policies or procedures.
> For each such inspection, please state: the date the inspection occurred; the names and contact information of all BNSF employees or non-attorney agents who participated; whether any BNSF employee or non-attorney agent took photographs or videos; and whether any BNSF employee or non-attorney agent generated drawings, notes, or other documents recording the participants' observations.

Mem. in Supp., Ex. 1 Local Rule 37.2 Addendum at 7 (Dkt. 41-2). The Interrogatory requested specific factual details about the date of any inspection, the identities of non-attorneys present, and whether any documents were created by non-attorneys present. *Id.* BNSF objected on work-product grounds, but gave limited details about one inspection on July 14, 2014. At oral argument, BNSF counsel acknowledged another inspection on July 21, 2014. But there is no indication that BNSF provided the Sherwoods a verified discovery response acknowledging that inspection or another inspection the Sherwoods allege occurred on August 29, 2014. BNSF

counsel admitted that there were photo logs created from each inspection, but denied that these logs were requested in discovery. It is not clear whether the photo logs were created by counsel. Regardless, RFP 11 sought "all documents related to the inspection of the Crossing and the track in one mile in either direction from January 1, 2010 to the present." *Id.* at 8. Even if the photo logs – which were not produced – were created by counsel, BNSF was obligated either to produce them in response to RFP 11 or to include them on a timely-provided privilege log. It did neither of those things.

The Court's reasoning on this issue is the same as on the issue of the general incident investigation procedures issue, *supra*. Thus, the Court concludes that BNSF has not established it was entitled to withhold documents responsive to Interrogatory 15 or RFP 11. Accordingly, the Court will grant the Sherwoods' motion to compel to the extent it seeks an order requiring BNSF to supplement its responses to Interrogatory 15 and RFP 11, to be consistent with this Memorandum Decision and Order. This must include production of the photo logs.

Next, the Court considers the Sherwoods' request for disclosure of BNSF's "72-Hour Checklist" that was completed after Mr. Sherwood's incident. This is a standard form that BNSF's Claims department may use when an incident occurs. It is not always, or not necessarily, provided to counsel after it is filled out. Flatten Dep. 72:18–25 (Dkt. 100-1). BNSF asserts the form is protected by both the attorney-client privilege and the work-product doctrine. However, when directly asked during BNSF's Rule 30(b)(6) deposition whether the form was generated before or after the involvement of counsel, Mr. Flatten said it was generated "for involvement of counsel." Flatten Dep. 73:13–22 (Dkt. 100-1). When pressed on "whether the form was initiated before counsel was involved in this case," Mr. Flatten responded that "[i]t was generated at the request of counsel to provide information specific to this case." *Id.* 74:5–9. When the

Sherwoods' counsel sought to confirm Mr. Flatten's answer meant that "the form was generated after counsel was involved," Mr. Flatten responded that "information was compiled within a 72-hour format in order to provide information to counsel, yes." *Id.* 74:10–21. When the Sherwoods' counsel continued to try to clarify the patent ambiguity in Mr. Flatten's testimony, BNSF's counsel objected that the question was asked and answered and instructed Mr. Flatten not to answer. *Id.* 74:22–76:11.

The Court has reviewed this document *in camera*. Each page of it bears an all-caps notation at the bottom that it is an "attorney client privileged document – created at the direction of counsel and in anticipation of litigation." Such language, of course, is part of what the Court considers but it is not determinative on its own. The form contains approximately thirty different fields documenting the basic facts of the incident (who, what, where, when) as well as particular types of data or information that might be relevant to the incident, such as whether any audio, video, or photographs are known to exist. Approximately ten fields read "N/A", but the remaining fields contain various facts about the incident or evidence related to it. Nothing in the form indicates that its purpose is to seek legal advice or that any attorney was involved in filling it out. Nothing in the form indicates that the form could not be used for general business purposes, including purposes related to operational safety or regulatory requirements. In short, there is nothing whatsoever in the form that gives any indication who filled it out or why. Nor did BNSF provide information in a privilege log that would enable either the Sherwoods or the Court to assess its assertion of privilege.

Those facts combined with the opaque nature of the answers given by Mr. Flatten (and the less than precise statements by BNSF's counsel about the same during oral argument)

convince the Court that BNSF has failed to meet its burden to establish that the document is protected by the attorney-client privilege.

Hence, the Court will grant the Sherwoods' request that the 72-hour form be disclosed to them. The Court further finds that a blank copy of this form should have been produced in response to RFP 37, discussed above. That RFP requested "policies, procedures, or rules for . . . logging information about the incident in any software program, application, or database; documenting the scene; taking and preserving photographs; preserving physical evidence; generating incident reports; and/or completing incident reports." The very existence of this form indicates BNSF has a procedure for generating or completing incident reports, belying BNSF's argument that there are no other responsive documents to produce. As indicated at oral argument, the Court will not permit BNSF to withhold responsive documents on the basis that the request was not precisely formulated to BNSF's satisfaction. The plaintiffs and their counsel cannot be expected to request documents with absolute precision based upon BNSF's own descriptors or "form numbers," when such descriptors and form numbers are known only to BNSF. Accordingly, BNSF shall produce both the blank and the completed 72-hour form to the Sherwoods.

Next, the Sherwoods seek the production of certain sketches someone from BNSF made of the crossing. Mr. Flatten testified he knew certain sketches existed, but he had not seen them and did not know who created them. Flatten Dep. 71:17–22 (Dkt. 100-1). BNSF has not identified any sketches on a privilege log. Nor did it clarify in its briefing any of the relevant circumstances surrounding the sketches; it merely states they "exist in BNSF's counsel's files and are protected attorney work product." BNSF Resp. 14 (Dkt. 52). However, at oral argument BNSF affirmatively asserted for the first time that the sketches were created by counsel.

Here again, BNSF is only forthcoming with information about the documents after the time for disclosure of the fact of such documents, and after the basis for any claim of privilege or work product protection should have been identified. These documents are a classic example of the reason for a privilege log, and the task of identifying the fact of such sketches along with the reason for not producing them to the Plaintiffs could have been easily done. It was not done and the Court is troubled that BNSF did not do so in this instance until oral argument – and arguably did not fully do so even then. On those facts, whatever privilege or work product protection might have been available has unequivocally been waived. Accordingly, BNSF is ordered to review its files and produce to the Sherwoods any and all sketches made of the crossing, as referenced by Mr. Flatten in his deposition.

Next, the Sherwoods request photo logs of the photos BNSF took of the crossing during its investigations. Mem. in Supp. 13 (Dkt. 41-1). BNSF argues the Sherwoods never asked for photo logs through formal discovery. BNSF Resp. 15 (Dkt. 52). This argument is not persuasive. The Sherwoods inquired "whether any BNSF employee or non-attorney generated drawings, notes, or other documents recording the participants' observations" at Interrogatory 15. They further requested "all documents related to the inspection of the Crossing . . . from January 1, 2010 to the present" at RFP 11. Finally, they also requested "all documents (specifically including, but not limited to, photographs, videos, drawings, and notes) generated by BNSF employees or non-attorney agents during any inspection of the Crossing that occurred following the crash at issue in this case; that was related, in whole or in part, to investigating the crash; and that was performed pursuant to BNSF policies or procedures" at RFP 35.

The Court concludes that the photo logs are fairly covered by each of these discovery requests and will compel BNSF to produce them, as discussed above. The Court will also order

BNSF to review Interrogatory 15, RFP 11, and RFP 35 and its prior responses to each, and to supplement its responses as necessary to comply with this decision and with the applicable discovery rules.

Next, the Sherwoods seek the production of documented measurements they allege BNSF took. Mem. in Supp. 13–14 (Dkt. 41-1). They note that inspection photos from two different dates depict BNSF personnel with measuring devices in hand, but BNSF has not produced any documents of measurements taken other than a single imprecise measurement in a disclosed Report of Inspection. BNSF contends "[e]verything from these inspections has been produced." BNSF Resp. 15 (Dkt. 52). That statement is incorrect, as BNSF has acknowledged that there are photo logs from those inspections it has not produced. Accordingly, the Court will order BNSF to review its files and produce any documented measurements that exist.

Next, the Sherwoods seek documents regarding any additional inspections, including an alleged inspection during the November 2014 rehabilitation of the crossing. Mem. in Supp. 14–15 (Dkt. 41-1). BNSF again asserts that it has disclosed all responsive documents and that there were no additional inspections. BNSF Resp. 16–18 (Dkt. 52). It argues that the rehabilitation was not an "investigation" and it was therefore outside the scope of the Sherwoods' discovery requests. *Id.* at 17–18. It also notes that the Sherwoods deposed BNSF employee Arne Olson, who worked on the crossing after the incident, and they could have questioned him about any repairs he made to the crossing. The Sherwoods reply that even if the rehabilitation was not an "investigation" under RFP 35, it was undoubtedly encompassed within RFP 12, which sought "documents related to the maintenance or repair of the Crossing." Reply in Supp. 9 (Dkt. 88). Further, they contend that "BNSF did not reveal in written discovery that Mr. Olson was involved in the repair. BNSF's counsel ordered Mr. Olson to make the repair, failed to disclose

this in response to Interrogatory No. 6, failed to have Mr. Olson document the repair – and now blames the Sherwoods for not asking about it." *Id.* The Sherwoods propounded Interrogatory 6 on May 13, 2016 and deposed Mr. Olson on November 9, 2016. It was not until October 11, 2017, more than eleven months later, that BNSF revealed for the first time that Mr. Olson had made repairs to the crossing.[7] *Id.*

The Sherwoods' argument on this point is well-taken. The discovery rules are designed to discourage parties from hiding the ball, with an order to compel as one of the court's primary tools to remedy such conduct. Accordingly, the Court will order BNSF to produce all documents relevant to the November 2014 rehabilitation. The Court will also order BNSF to produce all responsive documents regarding any other inspection, investigation, maintenance, or repair of the crossing from January 1, 2010 to the present.

Separately, during oral argument on this motion the parties discussed whether BNSF had complied with the Sherwoods' discovery requests regarding certain "VOB" or "video-on-board" recordings. These are recordings made by trains passing through the crossing shortly after the incident occurred, including at least one video showing first responders on scene. To date, BNSF has produced only two screenshots from these videos. It argued at the hearing that it has not produced the videos or allowed the Sherwoods to view them because they were not requested and because doing so would violate a third-party software licensing agreement.

_____

[7] The Court is aware that this allegation mirrors a finding by the trial judge in the pending Minnesota case referenced earlier in this decision, that "BNSF has engaged in a pattern of misconduct throughout this case characterized by late production of documents and witnesses..." Order and Mem. 32 (Dkt. 123-1). That finding was based in part on the plaintiff's assertion that BNSF "engaged in the practice of not producing documents critical to the questioning of specific witnesses until after their depositions were concluded." *Id.* at 30.

In this instance, the Court agrees that RFP 35 could be read as *not* requesting the VOB recordings. The request seeks, in pertinent part, "videos…generated by BNSF employees…during any inspection of the Crossing that occurred following the crash…that was related, in whole or in part, to investigating the crash; and that was performed pursuant to BNSF policies or procedures."[8] The record does not indicate that the VOB recordings had any connection, in whole or in part, to investigating the crash pursuant to BNSF policies or procedures. Rather, the record (including the hearing record) indicates that such video recordings were simply made in the ordinary course, from a train that just happened to come through the crossing shortly after the incident occurred. In other words, the fact of the VOB recording happened to be coincidental to the timing of the incident, rather than precipitated by the fact of the incident.

If those were the only details relevant to this particular issue, the Court would rule in favor of BNSF on this issue. However, BNSF answered RFP 35 in this manner: "The documents, photographs etc. [sic] relative to the July 14, 2014 inspection have been produced. Please also see objection and answer to Interrogatory No. 15." Among the items produced by BNSF were two "screenshots" from the video – in other words, still images taken from the video. The upshot of those facts is that there is discoverable information on the VOB, that some "pieces" of that discoverable information – in the form of screenshots – was produced in response to RFP 35, and that producing such information (as distinguished from the technology used to obtain such information) can be done without violating any sort of software license agreement.

---

[8] RFP 11 similarly sought "all documents related to the inspection of the Crossing and the track in one mile in either direction."

Accordingly, the Court will order that BNSF either produce the VOB in its original form (or a direct copy of its original form), or in a different form which maintains the same image quality as the original form. BNSF can request a protective order as to the use of the video, and/or the means of viewing the video, before producing the same and the Court recommends to the parties that they seek to stipulate upon the form of such a protective order before it is presented to the Court. Further, the Court finds that it is not necessary for BNSF to turn over the entirety of such video, but rather BNSF is required to produce the 60 seconds leading up to entering the crossing at issue, the period in which the train is passing through the crossing, and the 60 seconds following the exit from the crossing. The video shall be produced in its unedited native format (or in another format mutually agreed to by the parties), and BNSF shall provide whatever measures are needed for Plaintiffs to view the video, if such special measures are required, at a time and place to be agreed upon by the parties. If Plaintiffs contend that they should be entitled to see any other portion of the video, they will need to file a separate motion with the Court articulating reasoning and authority upon which such a request should be granted.

Finally, the Sherwoods seek an order reopening BNSF's Rule 30(b)(6) deposition with instructions that BNSF's designee must answer questions about investigation activities occurring more than 72 hours after the crash. Mem. in Supp. 15 (Dkt. 41-1). They contend that Mr. Flatten was instructed by counsel not to answer any questions about BNSF's investigation after counsel became involved, which prevented the Sherwoods from learning factual details about the investigation and from refuting the claim of privilege. *Id.* at 8–9. Although BNSF did not brief this issue, counsel's objections during Mr. Flatten's deposition staked out the position that everything BNSF did after counsel became involved is protected by privilege: "I'm going to put a further objection on the record that you are delving into attorney-client privilege. As you know,

I've been working on this case since 72 hours after the incident. So anything beyond that would be my mental impressions and my interactions with the BNSF claims team." Flatten Dep. 37:18–21 (Dkt. 100-1). Counsel later restated the objection: "Everything after the 72 hours, after we were involved as counsel representing the company in this case is going to be privileged. It's just the way it is." *Id.* at 110:19–22. BNSF maintained this position at oral argument.

As described above, BNSF has overstated the applicability of the attorney-client privilege and work-product doctrine by asserting the protections apply to all interactions with counsel and by refusing to allow inquiry into the factual circumstances surrounding its assertions. It bears repeating that the mere involvement of an attorney in a matter does not cloak everything the attorney does or says in privilege. Nor is "privilege" an incantation whose mere utterance creates a *fait accompli*; an opposing party is entitled to inquire about the surrounding circumstances to evaluate for itself whether privilege applies, and to challenge the assertion if it is appropriate to do so. Accordingly, the Court will grant the Sherwoods' motion for an order reopening BNSF's Rule 30(b)(6) deposition on the topic of investigation activities occurring more than 72 hours after the crash. In making that decision, the Court is not ordering that the attorney-client privileged is waived as to any communications that qualify for the privilege, but the Court is ordering that counsel for the Sherwoods shall be permitted to inquire into the basis for the invoking of such privilege. If a dispute arises, and the parties cannot reach agreement upon whether a question requires an answer or not, the parties can seek the contemporaneous involvement of the Court to resolve such disputes. If the Court concludes that either party has taken an unreasonable position in regard to the same, that is not justified by rule or existing law, the Court will consider imposing sanctions upon the offending party.

## C. Interrogatories Regarding Destruction of Physical Evidence

The Sherwoods seek formal answers to their interrogatories regarding destruction of physical evidence. Mem. in Supp. 15–17 (Dkt. 41-1). Interrogatory 7 seeks information about the chain of custody and testing of the cement planks present at the crossing on the day of the incident, many of which were subsequently lost or destroyed. Mem. in Supp., Ex. 1 Local Rule 37.2 Addendum at 5 (Dkt. 41-2). Interrogatory 8 seeks information about the loss or destruction of any responsive documents or physical evidence. *Id.* at 6. BNSF answered both Interrogatories and later formally supplemented its answer to one of them. *Id.* at 5, 6. The Sherwoods contend that new information has come to light since BNSF last formally responded to the Interrogatories and that it has therefore violated its duty to supplement its answers. Counsel have exchanged numerous emails regarding the subject of these Interrogatories. Mem. in Supp. 16 n.9 (Dkt. 41-1). But the Sherwoods argue counsel's unsworn emails are not an adequate substitute for a formal (i.e., sworn) response, and, regardless, the emails do not completely answer the Interrogatories anyway. *Id.* at 16–17. BNSF responds that it has already provided the Sherwoods' counsel all the information it has on these topics.

Rule 33(b)(3) provides that "[e]ach interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." Rule 26(e)(1) provides that:

> A party who . . . has responded to an interrogatory . . . must supplement or correct its disclosure or response:
>> (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or
>> (B) as ordered by the court.

Applying these rules, it is clear BNSF provided at least some written supplementation, which is consistent with Rule 26(e)(1)(A) without violating Rule 33. But the Sherwoods maintain that

these informal supplementations, aside from being improper, were also incomplete. Reply in Supp. 9–10 (Dkt. 88). They seek an explanation of "who had custody of the planks at what times, how half the planks mysteriously resurfaced, and why [BNSF] destroyed all of the other physical evidence despite an alleged internal preservation request." *Id.* at 10. These are salient questions.

The Court will grant the Sherwoods' motion to compel on this subject, and BNSF is ordered to provide sworn and formal supplementation to Interrogatories 7 and 8, in the form required by the rules. The facts in this case disclose a possibility of spoliation. The supplemental answers must lay out all of the responsive information, even if previously provided, and they must be sworn.

### D.  Deposition Answers Regarding Failure to Preserve Physical Evidence

The Sherwoods seek to reopen BNSF's Rule 30(b)(6) for additional questioning regarding the preservation of physical evidence. Mem. in Supp. 17–18 (Dkt. 41-1). They note that counsel told Mr. Flatten not to answer any questions about BNSF's preservation of evidence occurring more than 72 hours after the incident. *Id.*[9]

As already discussed, BNSF's broad and preemptive assertion of privilege in such circumstances is too broadly drawn. The Court will therefore grant the Sherwoods' request to reopen BNSF's Rule 30(b)(6) deposition on the topic of preservation of evidence. BNSF is ordered to make Mr. Flatten available, or if the parties agree, make a corporate representative

---

[9] During the deposition, BNSF counsel objected that evidence preservation issues were outside the scope of the topics listed on the notice of deposition. However, BNSF permitted Mr. Flatten to answer questions on the subject, but directed him not to answer any questions about BNSF's preservation of evidence occurring more than 72 hours after the incident. Whatever validity there might have been to objecting to any questions posed to Mr. Flatten on the subject because the subject was outside the 30(b)(6) notice, it was waived by counsel permitting Mr. Flatten to answer some questions on the subject but then instructing him not to answer others.

other than Mr. Flatten available, for further deposition on the topic of evidence preservation. If BNSF objects on privilege grounds during the re-opened deposition, it must be prepared to provide sufficient detail about the precise circumstances surrounding its objection to allow an evaluation of its claim of privilege. The Court will carefully scrutinize any further claims that an assertion of privilege is unjustified or overbroad.

**E. Discovery Regarding Post-Crash Crossing Alterations**

The Sherwoods seek formal supplemental responses to Interrogatory 6 and RFP 12, both regarding BNSF's post-incident alterations of the crossing. Mem. in Supp. 18–19 (Dkt. 41-1). They contend that, at a minimum, BNSF closed the separation between the planks and replaced or rotated one of the crossing planks, but that it has not produced any interrogatory response or document regarding these activities. *Id.*

BNSF previously responded to both Interrogatory 6 and RFP 12, raising some objections but also disclosing certain information and documents. Additionally, in its responsive briefing here, BNSF submitted a declaration by its employee Mr. Olson, dated October 11, 2017, who testified that he was told by counsel on or about July 21, 2014 to close the separation between the two crossing planks in the crossing. Olson Decl. ¶¶ 2, 3 (Dkt. 56). He further testified that he did not recall when the separation was closed or who did it, despite having searched for relevant records and spoken with the employees who likely would have done the work. *Id.* ¶¶ 4–7. He expressly mentioned that it was difficult for anyone to recall doing the work, because it was over three years ago. *Id.* at ¶ 7.

Mr. Olson's declaration regarding the facts of his post-incident alterations to the crossing – facts to which the Sherwoods are doubtless entitled – was filed more than three years after the incident, and he also testifies that he no longer recalls key details because it was so long ago. In

light of that delay, the Court will grant the Sherwoods' motion to compel to the extent it seeks sworn supplementations to Interrogatory 6 and RFP 12. This supplementation must also include an explanation why Mr. Olson's alterations were not disclosed sooner.

**F. Expenses**

Finally, the Sherwoods seek an award under Rule 37(a)(5) of their reasonable expenses in making this motion. They argue that "BNSF has pervasively obstructed discovery and ignored clear legal precedent in this case and others." Mem. in Supp. 19 (Dkt. 41-1). BNSF did not specifically oppose the request for fees, instead focusing on opposing the merits of the motion. The Sherwoods' motion to compel is granted. Therefore, the Court must, after giving an opportunity to be heard, award the Sherwoods' reasonable fees in bringing this motion unless an exception applies. The Court finds no exception applies, and will grant the Sherwoods' request for their reasonable expenses. The Court will entertain a separate motion and briefing to establish the amount of expenses to award.

## CONCLUSION

BNSF has consistently overstated the extent of applicable privileges and protections and has not provided the details necessary to assess its claims of privilege or protection. It has also narrowly construed propounded discovery requests so as to avoid producing relevant and responsive information and documents. Therefore, the Sherwoods' motion to compel is granted in the measure described in this decision. BNSF must supplement its discovery responses and permit additional deposition questioning as described herein.

\ \ \

\ \ \

\ \ \

## <u>ORDER</u>

Based on the foregoing, **IT IS HEREBY ORDERED** that Plaintiffs' Motion to Compel (Dkt. 41) is **GRANTED**. BNSF is ordered to produce to the Sherwoods, <u>within 14 days of the date of this order,</u> sworn supplemental responses to **Interrogatories 6, 7, 8, and 15** as well as **RFPs 11, 12, 35, and 37** as described herein. At a minimum, these supplemental responses must disclose the following particular documents, electronically stored information, tangible things, or information, in addition to relevant and responsive details relating thereto:

1. Those "procedures that are written down" to which Mr. Flatten referred during his deposition;

2. The "BNSF Claims Manual" and the "BNSF Law Department Guide";

3. Any and all photo logs related to BNSF's photographs of the crossing;

4. The "72 Hr Grade Crossing/Trespasser Checklist" or "72-Hour Checklist" for Mr. Sherwood's incident and in blank;

5. Any and all sketches of the crossing, as referenced by Mr. Flatten in his deposition;

6. Any and all documented measurements relating to Mr. Sherwood's incident, BNSF's investigation, or any repair or maintenance of the crossing;

7. Complete copies of any and all VOB or "video on board" footage recording the period during which the train is passing through the crossing on the day of Mr. Sherwood's incident as well as 60 seconds before and 60 seconds after such footage; and

8. BNSF's explanation for waiting until October 2017 to disclose that the crossing had been altered by Arne Olson or another BNSF employee or agent in 2014.

BNSF is further ordered to make available a corporate representative for up to four additional hours of deposition testimony under Federal Rule of Civil Procedure 30(b)(6) on the following topics:

1. BNSF's "file system" for investigating incidents;

2. BNSF's investigation activities occurring more than 72 hours after the incident; and

3. BNSF's evidence preservation in this matter.

This re-opened deposition is to occur <u>within thirty days of the date of this order</u> unless the Court approves a date certain, presented by stipulation of the parties, that is more than thirty days hence.

Further, **IT IS HEREBY ORDERED** that Defendant's Motion to Strike Supplemental Authority (Dkt. 125) is **DENIED**.

DATED:  **May 9, 2018.**

_____
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge